UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DENNIA HICKS, | ) | Case No. 1:17CV1957 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | MEMORANDUM AND ORDER |

Plaintiff Dennia Hicks ("Hicks" or "claimant") challenges the final decision of

Defendant Commissioner of Social Security ("Commissioner"), denying her

applications for a period of disability, disability insurance benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This court has jurisdiction

pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States

Magistrate Judge pursuant to the consent of the parties. (R. 13.) The issue before

the court is whether the final decision of the Commissioner is supported by

substantial evidence and, therefore, conclusive. For the reasons set forth below, the

Commissioner's final decision is remanded.


I. PROCEDURAL HISTORY

On September 10, 2013, Hicks filed two applications for a period of disability

and DIB, and for SSI benefits, with both applications alleging disability beginning December 31, 2012. (R. 11, Transcript ("tr."), at 29, 214-219, 235-245.) Hicks's applications were denied initially and upon reconsideration. (*Id.* at 91-120, 121-154, 155-161.) Thereafter, Hicks filed a written request for a hearing before an administrative law judge. (*Id.* at 171-172.)

An Administrative Law Judge ("the ALJ") held the hearing on March 2, 2016. (R. 11, tr., at 46-77.) Hicks appeared at the hearing, was represented by counsel, and testified. (*Id.* at 48- 71.) A vocational expert ("VE") also attended the hearing and provided testimony. (*Id.* at 49, 69-76.) On March 31, 2016, the ALJ issued his decision, applying the standard five-step sequential analysis to determine whether Hicks was disabled. (*Id.* at 29-40; *see generally* 20 C.F.R. §§ 404.1520(a), 416.920(a).) Based on his review, the ALJ concluded Hicks was not disabled. (*Id.* at 29, 40.) The Appeals Council denied Hicks's request for review, thus rendering the ALJ's decision the final decision of the Commissioner. (R. 11, tr., at 1-3.)

Hicks now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). The parties have completed briefing in this case. Hicks's brief asserts that the ALJ erred when evaluating the pertinent opinion evidence. (R. 16, PageID #: 2116.)

## II. PERSONAL BACKGROUND INFORMATION

Hicks was born in 1966, and was 46 years old on the alleged disability onset date. (R. 11, tr., at 37, 214, 235.) Accordingly, Hicks was considered a younger

individual age 45-49 for Social Security purposes.  *See* 20 C.F.R. §§ 404.1563,

416.963.  Hicks has a ninth-grade education, and is able to communicate in English.

(R. 11, tr., at 37, 52, 238.)  Hicks had past relevant work as a short order cook, and a

combination job of home attendant/resident care aide.  (R. 11, tr., at 37, 71-72.)


### III.  RELEVANT MEDICAL EVIDENCE[1]

Disputed issues will be discussed as they arise in Hicks' brief alleging error

by the ALJ.  As noted earlier, Hicks applied for DIB and SSI benefits on September

10, 2013, alleging disability beginning December 31, 2012.  (R. 11, tr., at 29, 214-

219.)  Hicks listed her physical or mental conditions that limit her ability to work

as:  "depression; hbp; anxiety; fibromyalgia; diabetes 2; arthritis; neck; shoulders;

knees lock; constant pain needles feelings like a pulling."  (R. 11, tr., at 239.)  Hicks'

assignment of error concerns the opinions of Dr. Placeway, Dr. Morton, and Dr. Wax

(R. 16, PageID #: 2116), so the court will primarily focus on their treatment of

Hicks.

At a February 26, 2013, appointment with Nurse-Practitioner ("NP") Jean

Knudsen, Hicks reported that she was severely depressed, was caring for both her

mother and her granddaughter, and was very stressed.  (R. 11, tr., at 445.)  Hicks

reported that she lost her job "because she missed too much work caring for mother

and grandchild."  *Id.*  She was not sleeping, and was taking Nyquil.  *Id.*  Hicks was

---

[1] The summary of relevant medical evidence is not intended to be exhaustive.  It
includes only those portions of the record cited by the parties and also deemed
relevant by the court to the assignments of error raised.

assessed with depressive disorder, but was doing much better. *Id.* at 446. She had
diabetes mellitus Type II, uncontrolled, hypertension ("HTN"), and hyperlipidemia
("HLD"). *Id.*

On June 11, 2013, Hicks visited Elva Thompson, CNP, to establish care as a
new patient. (R. 11, tr., at 564.) Hicks reported she had been having joint pain in
her shoulder, knees, elbows and ankles. *Id.* She was diagnosed with osteoarthritis
in her left knee, but had not been taking the medication prescribed for it. *Id.* Her
medications for joint pain were changed. *Id.* at 466.

At an August 14, 2013, visit with Eric Friess, M.D., Hicks complained of a
long history of leg pain and cramping "but walks her dog many blocks daily." (R. 11,
tr., at 903.) The doctor noted that Hicks was not taking the prescribed medications
as directed, and "insists they do not work for pain control." *Id.* at 903-904. Hicks
requested a referral for a chronic pain management consult. *Id.* at 903.

Hicks applied for DIB and SSI benefits on September 10, 2013. (R. 11, tr., at
214-219.) On September 23, 2013, Hicks had a mental health assessment
conducted by Tina S. Oney, Psychiatric Clinical Nurse Specialist ("PANS"). (R. 11,
tr., at 928-933.) Hicks reported depression and anxiety. *Id.* at 928. Nurse Oney
reported that Hicks seemed to be seeking medication for anxiety but "did not appear
anxious at all." *Id.* at 929. She reported that she had fibromyalgia, and that she
quit her job "because she was in too much pain and had anxiety." *Id. But see* R. 11,
tr., at 445. Oney's impression was that Hicks had Adjustment Disorder with

Depressed Mood. *Id.* at 932. The plan was to start a trial of Vittaria, and counseling. *Id.* at 933.

On referral from Dr. Friess, Hicks presented to Kutalba Tabbas, M.D., for her complaints of longstanding pain in her neck, and both arms and legs, on September 24, 2013. (R. 11, tr., at 938-941, 522-523.) Her pain was described as "pinching, sharp, dull, cramping, nagging and is relieved by nothing." *Id.* at 938. Dr. Tabbas assessed that Hicks' "duration for standing is worse after 3 days of standing at work, sitting is unremarkable, and walking is unremarkable." *Id.* Hicks reported trouble sleeping. *Id.*

On physical examination, Hicks complained of pain with range of motion in her cervical and lumbar spine. (R. 11, tr., at 940.) She had normal sensation, normal motor strength, normal fine motor coordination, and normal gait. *Id.* She had 18 trigger points. *Id.* Neck and lumbar X-rays showed minimal disc degeneration at L5-S1, but no major disc degeneration or degenerative joint disease. *Id.* at 941. Hicks was administered an IV lidocaine injection. *Id.*

Dr. Tabbas' plan was for Hicks to begin pool therapy, walking in the pool for about thirty minutes, three times per week. (R. 11, tr., at 941.) In addition, Hicks was prescribed a "Tramadol Cocktail." *Id.*

On November 5, 2013, state agency medical consultant Maria Congbalay, M.D., reviewed the medical record and opined that Hicks could occasionally lift or carry twenty pounds, and ten pounds frequently. (R. 11, tr., at 101.) Her ability to push or pull was otherwise unlimited. *Id.* She could stand or walk six hours of an

eight-hour workday, and sit for six hours of a workday.  *Id.*  The claimant had
postural limitations due to her obesity, uncontrolled diabetes mellitus, fibromyalgia,
and knee and back pain.  *Id.*  Hicks could frequently stoop, kneel, crouch, and crawl,
and occasionally climb ladders, ropes, or scaffolds.  *Id.*  She had no limitations for
climbing stairs or ramps, or for balancing.  *Id.*

On November 19, 2013, Hicks had a consultative psychological evaluation
with psychologist Mitchell Wax, Ph.D.  (R. 11, tr., at 668-673.)  "The claimant's chief
complaint about why she is not able to work is that she has medical problems."  *Id.*
at 668.  Hicks reported that she lived with her mother and her six–year-old
granddaughter.  *Id.* at 669.  She told Dr. Wax she left school in 9th grade, but "she
has since gone back to school online and obtained a high school diploma[2] in 2008."
*Id.* Hicks reported to Dr. Wax that her last job was as a cook, where she worked for
six months before being fired, "because I had too many absences."  *Id.* at 670.  She
indicated that she had been fired from most of her jobs due to absenteeism.  *Id.*  The
claimant reported that she was often depressed, and she slept most of the day, or
watched television.  *Id.*  She does drive her granddaughter to school three or four
times per week, and after school she visits with her and does homework with her
until dinner time.  *Id.*  Dr. Wax described her speech as logical and coherent at
times, while at other times she was vague, and appeared to be mentally drifting.

---

[2] At the hearing, Hicks stated that she did not have a GED, although she had
indicated on her application that she did.  (R. 11, tr., at 51-52, *see id.* at 240
(indicating 2007 GED).)

*Id.* at 671. She described her usual mood as sad and depressed, with daily crying spells. *Id.* She seemed "fretful," and cried at times during the interview. *Id.*

Dr. Wax conducted no psychological testing, and apparently based his assessment on the clinical interview itself, along with a review of some medical records. (R. 11, tr., at 668, 671.) The psychologist noted Hicks had a past history of depression, and was taking antidepressant medication. *Id.* at 672. He indicated that claimant had difficulty maintaining a job, being fired from most of her jobs for absenteeism. *Id.* Dr. Wax suspected major depression with psychotic features. *Id.*

Dr. Wax's functional assessment of the claimant was that she "would have difficulty understanding, remembering, and carrying out instructions on a job due to her depression." (R. 11, tr., at 672.) Based on her performance on cognitive functioning tasks, such as remembering digits or simple words, adding by 3s to 40, etc., Dr. Wax indicated the claimant "appeared to be functioning in the low average range of intelligence." *Id.* at 671. Her ability to concentrate was intermittent. *Id.* Dr. Wax indicated the claimant would have difficulty maintaining attention and concentration on a job, based on that day's evaluation. *Id.* at 673. He stated that Hicks is able to perform simple tasks and perform multi-step tasks. *Id.* Dr. Wax also assessed that Hicks would have difficulty responding appropriately to supervisors and coworkers in a work setting, and responding appropriately to work pressures, due to her depression. *Id.*

On December 9, 2013, state agency psychological consultant Robelyn Marlowe, Ph.D., reviewed the record and opined Hicks had an affective disorder

that resulted in moderate restriction of her activities of daily living, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 11, tr., at 99.) Hicks had mild difficulties in maintaining social functioning. *Id.* More specifically, Dr. Marlowe assessed that Hicks was moderately limited in her ability to understand and remember detailed instructions, due to depression. *Id.* at 102. She was not significantly limited in her ability to remember work procedures or short and simple instructions. *Id.*

Dr. Marlowe also opined that Hicks was moderately limited in her ability to carry out detailed instructions, and to maintain attention and concentration for extended periods. (R. 11, tr., at 102-103.) The psychologist assessed that Hicks would be moderately limited in her ability to complete a normal workday or workweek without interruption from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number of breaks. *Id.* at 103. Dr. Marlowe noted that, due to claimant's preoccupation with her symptoms, her concentration and persistence would be variable, but intact for simple tasks. *Id.* Dr. Marlowe opined that Hicks was moderately limited in her ability to respond to changes in the work setting, and that she would need a slow-paced work environment due to her depression and preoccupation with her somatic symptoms. *Id.* She explained that claimant's main concerns are somatically related, that is, she is not in treatment for depression, and her depression is secondary to her physical complaints. *Id.*

On December 10, 2013, Hicks had a mental health assessment conducted by social worker Maria Mars. (R. 11, tr., at 1058.) Hicks reported she was depressed, in pain, and was uncomfortable walking and sitting. *Id.* Hicks indicated that she had been so uncomfortable during the psychological evaluation in November that "she was not able to respond to his questions." *Id.* Mars assessed depressive disorder, and recommended psychotherapy to improve her mood and relationships. *Id.* at 1063.

On May 6, 2014, state agency medical consultant Lynne Torello, M.D., reviewed the medical record on reconsideration and opined that Hicks could occasionally lift or carry twenty pounds, and ten pounds frequently. (R. 11, tr., at 132.) Her ability to push or pull was otherwise unlimited. *Id.* She could stand or walk six hours of an eight-hour workday, and sit for six hours of a workday. *Id.* The claimant had postural limitations due to her obesity, uncontrolled diabetes mellitus, fibromyalgia, and knee and back pain. *Id.* at 133. Hicks could frequently stoop, kneel, crouch, and crawl, and occasionally climb ladders, ropes, or scaffolds. *Id.* at 132-133. She had no limitations for climbing stairs or ramps, or for balancing. *Id.*

On May 7, 2014, state agency psychological consultant Leslie Rudy, Ph.D., reviewed the record on reconsideration and opined Hicks had an affective disorder that resulted in moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 11, tr., at 130.) Hicks had mild restriction in daily living activities. *Id.*

More specifically, Dr. Rudy assessed that Hicks was moderately limited in her ability to understand and remember detailed instructions, due to depression, and to carry out detailed instructions or to maintain attention and concentration for extended periods. (R. 11, tr., at 133-134.) The psychologist assessed that Hicks would be moderately limited in her ability to complete a normal workday or workweek without interruption from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number of breaks. *Id.* at 134. Dr. Rudy noted that, due to claimant's preoccupation with her symptoms, her concentration and persistence would be variable, but intact for simple tasks. *Id.* She also opined that Hicks would be moderately limited in her ability to interact appropriately with the general public, and to get along with coworkers and peers, because Hicks was socially isolated due to depression. *Id.* at 134-135.

Dr. Rudy opined that Hicks was moderately limited in her ability to respond to changes in the work setting, and that she would need a slow-paced work environment due to her depression and preoccupation with her somatic symptoms. (R. 11, tr., at 135.) She explained that claimant's main concerns are somatically related, that is, she is not in treatment for depression, and her depression is secondary to her physical complaints. *Id.* Hicks retains the capacity to carry out 1-4 step tasks in a setting without demands for a fast pace or high production. *Id.* She can interact on an occasional and superficial basis, and she can adapt to infrequent changes in routine with some supervisory support. *Id.*

On October 13, 2014, Hicks presented to Jared Placeway, D.O., at Metro Health to establish a new patient relationship. (R. 11, tr., at 1603-1608.) Dr. Placeway evaluated Hicks for chronic pain and for a functional capacity assessment. *Id.* at 1603. Hicks reported the most pain was around her left elbow, and also shooting pain from her right hand to her elbow. *Id.* She reported the pain occurs every two to three months, and last for 20-30 minutes at a time. *Id.* at 1604. She has had low back pain, beginning two years previously, which is worse when she is standing and cooking. *Id.* Hicks also reported bilateral leg pain, which occurs when she's active, but improves with rest. *Id.* Hicks walks her dog four to five days a week, for approximately half a mile. *Id.* Hicks reported that Flexeril does help. *Id.* She stated she can sit for approximately thirty minutes, and can walk for two to three miles. *Id.* She can lift a gallon of milk, and is able to bend forward to pick things up, to twist and stoop, but able to squat with pain. *Id.* Hicks reported she has aching in her legs and pelvis when sitting for more than two hours. *Id.*

Dr. Placeway noted that x-rays of her right elbow taken in March 2014 showed no fracture, dislocation or arthritic change, nor any evidence of joint effusion at the elbow. (R. 11, tr., at 1604.) The doctor noted that she was able to walk without devices, although she uses her mother's walker at time. *Id.* at 1605. She can perform activities of daily living at an independent level. *Id.*

On physical examination, Dr. Placeway found that Hicks had full motor strength in her arms and legs. (R. 11, tr., at 1607.) She had intact sensation and reflexes, a non-antalgic gait with a normal base of support and a mild decreased

cadence and stride length. *Id.* She had limited cervical and lumbar flexion, due to subjective pain, and numerous fibromyalgia tender points. *Id.*

On functional tasks, Hicks was able to lift 15-20 pounds at waist level with no significant pain, although she reported pain in her shoulders when she attempted to lift 25 pounds. (R. 11, tr., at 1607.) Her grip strength was thirty pounds for each hand. *Id.* at 1608.

Dr. Placeway opined that Hicks had moderate functional limitations: She is able to lift up to twenty pounds at waist level occasionally, and she can sit for a maximum of thirty minutes at a time "for a maximum of 6-8 hours per day." (R. 11, tr., at 1608.) The doctor stated that Hicks could work at a sedentary level, and may be able to tolerate light work, "but it is very difficult to estimate her full functional capabilities as she is limited by diffuse pain." *Id.* Dr. Placeway recommended that claimant remain active, including frequent low-impact aerobic activity such as swimming or walking. *Id.*

Hicks presented to Antwon Morton, D.O., on December 4, 2015, to establish a new patient relationship at the Physical Medicine and Rehabilitation ("PM&R") Clinic. (R. 11, tr., at 1997.) Hicks' chief complaint was diffuse pain. *Id.* Dr. Morton's report was remarkably similar and, as noted herein, duplicative to Dr. Placeway's October 2014 report. *Compare* R. 11, tr., at 1997-2001 *with id.* at 1603-1608. Dr. Morton evaluated Hicks for chronic pain. *Id.* at 1997. Hicks reported shooting pain from her right hand to her elbow. *Id.* She reported the pain occurs every two to three months, and last for 20-30 minutes at a time. *Id.* She has had

low back pain, beginning three years previously, which is worse when she is standing and cooking. *Id.* at 1998. Hicks also reported bilateral leg pain, which occurs when she's active, but improves with rest. *Id.* Hicks walks her dog four to five days a week, for approximately half a mile. *Id.* Hicks reported that Flexeril does help. (R. 11, tr., at 1998.) She stated she can sit for approximately thirty minutes, and can walk for two to three miles. *Id.* She can lift a gallon of milk, and is able to bend forward to pick things up, to twist and stoop, but able to squat with pain. *Id.*

Dr. Morton noted that x-rays of her right elbow taken in March 2014 showed no fracture, dislocation or arthritic change, nor any evidence of joint effusion at the elbow. (R. 11, tr., at 1998.) The doctor noted that she was able to walk without devices, although she uses her mother's walker at time. *Id.* at 1999. She can perform activities of daily living at an independent level. *Id.*

On physical examination, Dr. Morton found that Hicks had full motor strength in her arms and legs. (R. 11, tr., at 2001.) She had intact sensation and reflexes, a non-antalgic gait with a normal base of support and a mild decreased cadence and stride length. *Id.* She had limited cervical and lumbar flexion, due to subjective pain, and numerous fibromyalgia tender points. *Id.*

Dr. Morton modified Hicks' medications. (R. 11, tr., at 2001.) The doctor stopped Tramadol, as it was not managing pain levels as well as previously, started Tylenol #3, and continued Gabapentin. *Id.* Dr. Morton recommended that claimant remain active, including frequent low-impact aerobic activity such as swimming or

walking. *Id.* He also recommended that Hicks follow up with a behavioral health specialist for mood disturbance related to chronic pain. *Id.*

Dr. Morton completed a medical opinion form on February 29, 2016, regarding claimant's physical ability to do work-related activities. (R. 11, tr., at 2054-2055.) Dr. Morton opined that Hicks was capable of lifting and carrying up to twenty pounds on an occasional basis, and ten pounds frequently. *Id.* at 2055. She had the ability to stand and walk about two hours of an eight-hour workday, and the ability to sit for about two hours of a workday. *Id.* The doctor opined that Hicks needed the opportunity to shift positions at will, and that she can only sit for ten minutes, stand for five minutes, or walk around for five minutes, before needing to shift positions. *Id.* Dr. Morton stated that Hicks will sometimes need to lie down at unpredictable intervals during the workday, as often as three times a day, for up to ten minutes each time. *Id.* Dr. Morton stated that claimant's fibromyalgia pain required the stated limitations. *Id.*

Dr. Morton also opined that Hicks could twist, stoop, crouch, and climb stairs and ladders occasionally. (R. 11, tr., at 2054.) The doctor asserted that the claimant's fibromyalgia pain limited her movements of reaching, pushing and pulling, without limiting her fingering, handling, or feeling. *Id.* He stated she was also limited in kneeling and crawling. *Id.* Dr. Morton opined that Hicks' symptoms associated with her impairments would frequently interfere with her attention and concentration at work, and that she would be absent on average more than four days per month because of her impairments or treatment. *Id.*

## IV. ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in his

March 31, 2016, decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since December 31, 2012, the alleged onset date (20 C.F.R. 404.1571 *et seq.* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: fibromyalgia, depressive disorder, anxiety/ post traumatic disorder (PTSD), obesity, diabetes mellitus, hypertension, and sleep apnea (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 C.F.R. 404.1545 and 416.945) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except for no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; and mental limitations that she can perform simple, routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) with superficial interpersonal interactions (no arbitration, negotiation or confrontation) (20 C.F.R. 404.1569a and 416.969a) .

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7. The claimant was born on ****, 1966, and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2012, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(R. 11, tr., at 31, 32, 34, 37-39.)


## V. DISABILITY STANDARD

A claimant is entitled to receive DIB or SSI benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a disability determination. *See* 20 C.F.R.

§§404.1520(a), 416.920(a); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001). The Sixth Circuit has outlined the five steps as follows:

First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled. *Id.* § 404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv). Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(v).

The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004); *see also* 20 C.F.R. § 416.920(a)(4).

VI.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence. *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more

than a scintilla of evidence, but less than a preponderance of the evidence. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Wright*, 321 F.3d at 614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Wright*, 321 F.3d at 614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). The court, however, may examine all the evidence in the record, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *Hubbard v. Commissioner*, No. 11-11140, 2012 WL 883612, at *5 (E.D. Mich. Feb. 27, 2012) (quoting *Heston*, 245 F.3d at 535).

## VII. ANALYSIS

Hicks presents the following legal issue for the court's review: "The ALJ erred by failing to evaluate the opinion evidence consistent with the regulations, Agency policy, and Sixth Circuit precedent." (R. 16, PageID #: 2116.) Hicks

identifies the ALJ's evaluations of the opinions of Dr. Placeway, Dr. Morton, and Dr. Wax as problematic. *Id.* at 2116, 2131-2146.

It is well-recognized that an ALJ must generally give greater deference to the opinions of a claimant's treating physicians than to non-treating physicians.[3] *Gayheart v. Commissioner*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544. This doctrine, often referred to as the "treating physician rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treatment relationship with an individual are often best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The treating physician doctrine requires opinions from treating physicians to be given controlling weight where the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)); *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544. In other words, treating physicians' opinions are only given deference when supported by objective medical evidence. *Vance v. Commissioner*, No. 07-5793, 2008 WL 162942,

---

[3] Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and purport to apply to the evaluation of opinion evidence for claims filed before March 27, 2017. 82 *Fed. Reg.* 5844-5884 (Jan. 18, 2017). Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision.

at *3 (6th Cir. Jan. 15, 2008) (citing *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003)).

Social Security regulations require the ALJ to give good reasons for discounting evidence of disability submitted by the treating physician(s). *Blakley, 581 F.3d at 406*; *Vance, 2008 WL 162942, at *3*. Those good reasons must be supported by evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight assigned to the treating physician's opinion, and the reasons for that weight. *Gayheart, 710 F.3d at 376*; *Blakley, 581 F.3d at 406-407*; *Winning v. Commissioner, 661 F.Supp.2d 807, 818-819 (N.D. Ohio 2009)* (quoting SSR 96-2p).

An ALJ must evaluate each medical opinion in the record. *Smith v. Commissioner, 482 F.3d 873, 875 (6th Cir. 2007)*; 20 C.F.R. §§ 404.1527(c), 416.927(c). State agency doctors are considered highly-qualified experts in disability evaluation, and the ALJ must consider their evidence. *20 C.F.R. §§ 404.1513a(b)(1)*; 404.1527(e), 416.913a, 416.927(e). Although the ALJ generally accords more weight to a treating source over those of a non-examining source, the ALJ is not prohibited from adopting the findings of a non-examining source. *See generally Ealy v. Commissioner, 594 F.3d 504, 514-515 (6th Cir. 2010)*; *Smith, 482 F.3d at 875*.

### A.  Dr. Morton

The ALJ addressed the opinion of Dr. Morton as follows:

> Partial weight is given to the medical source statement completed by Antwon Morton, M.D., dated February 29, 2016.[4] He noted that the claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently, occasionally stoop, crouch, climb ladders and would have limits on kneeling and crawling which is consistent [with] the overall evidence in the record. However, he also concluded that the claimant can only stand and walk for two hours, sit for two hours, would be absent more than four days per month and treatment records from MetroHealth and Lutheran hospitals establish that the claimant is not that limited (Exhibits 16F, 17F.)

(R. 11, tr., at 37.) In contrast, the ALJ gave "great weight" to the opinions of the state agency medical consultants, Dr. Congbalay and Dr. Torello. *Id.* at 36.

Hicks characterizes Dr. Morton as her "treating physician," and argues that the ALJ failed to so designate him. (R. 16, PageID #: 2132, 2137.) Hicks contends that the ALJ improperly failed to give Dr. Morton's opinion greater weight. *Id.* at 2137-2138.

The Commissioner responds that Hicks incorrectly classifies Dr. Morton as a treating physician, noting that he had only examined Hicks once. (R. 17, PageID #: 2163; *see generally* R. 11, tr., at 1997 (December 2015 "initial visit note"); 2054-2055 (February 2016 opinion.)) A treating physician is defined as a physician who has provided medical treatment or evaluation, and who has an "ongoing treatment relationship" with the patient. *Daniels v. Commissioner*, No. 04-5709, 2005 WL 2739084, at *5 (6th Cir. Oct. 24, 2005) (citing 20 C.F.R. § 404.1502); *Bryant v. Astrue*, No. 2:09-00093, 2010 WL 2901842, at *2 (M.D. Tenn. July 19, 2010) (citing 20 C.F.R. § 416.902).

---

[4] Actually, Dr. Morton is a "D.O.," rather than an "M.D." (R. 11, tr., at 1997, 2054.)

The Sixth Circuit has found that the treating physician relationship cannot arise from a single visit:

> The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records. *Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir. 1983). Dr. Ruff examined Mr. Barker on only one occasion, and the rationale of the treating physician doctrine simply does not apply here. Dr. Ruff's report was entitled to no special degree of deference. *Atterberry v. Secretary of Health & Human Servs.*, 871 F.2d 567, 572 (6th Cir. 1989).

*Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). *See also Smith*, 482 F.3d at 876 (doctor examined claimant only once, and wrote single physical capacity evaluation, which fails to evince ongoing treatment relationship contemplated by regulation) (citing *Daniels v. Apfel*, No. 00-5009, 2000 WL 1761087, at *2 (10th Cir. 2000)). It follows that the requirement that an ALJ give "good reasons" for rejecting the opinion of a treating physician does not apply to a one-time examining physician. *Smith*, 482 F.3d at 876; *Kornecky v. Commissioner*, No. 04-2171, 2006 WL 305648, at *9-*10 (6th Cir. Feb. 9, 2006).

Because Dr. Morton had only examined Hicks once at the time he wrote the medical source statements, the treating physician doctrine does not apply to the February 2016 opinion, and the opinion is entitled to no special degree of deference. *See, e.g., Smith*, 482 F.3d at 876; *Kornecky*, 2006 WL 305648, at *8; *Barker*, 40 F.3d at 794. That does not end the matter, however.

The ALJ has the responsibility for reviewing all the evidence in making his or her determinations. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). An ALJ is

required to evaluate all medical opinions, regardless of source, unless an opinion is a treating source's opinion entitled to controlling weight. *Smith*, 482 F.3d at 875 (ALJ must evaluate each medical opinion in the record); *Walton v. Commissioner*, 187 F.3d 639, 1999 WL 506979, at *2 (6th Cir. 1999) (TABLE, text in WESTLAW) (per curiam); 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ must then determine how much weight to give to each opinion. *Id.* "An administrative law judge may give more weight to the opinions of examining or consultative sources where the treating physician's opinion is not well-supported by the objective medical records." *Dyer v. Social Sec. Admin.*, No. 13-6024, 2014 WL 2609548, at *5 (6th Cir. June 11, 2014) (citing *Gayheart*, 710 F.3d at 376, 379-380). The ALJ will also consider any statements that have been provided by medical sources, whether or not based on formal medical examinations. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

Unless a treating source's opinion is given controlling weight, the ALJ is required to consider the following factors in deciding the weight to give any medical opinion: the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the source. 20 C.F.R. §§ 404.1527(c),(e), 927(c),(e); *see generally Gayheart*, 710 F.3d at 376; *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). While the ALJ is directed to consider the factors, the ALJ is not required to provide an "exhaustive factor-by-factor analysis" in the decision. *Francis v. Commissioner*, No. 09-6263, 2011 WL 915719, at *3 (6th Cir. March 16, 2011).

The Commissioner argues that "the ALJ properly considered Dr. Morton's February 2016 opinion and gave good reasons for discounting it." (R. 17, PageID #: 2166). But here, the ALJ simply stated that "treatment records from MetroHealth and Lutheran hospitals establish that the claimant is not [as] limited" as opined by Dr. Morton, without identifying any specific medical evidence of record in support of the statement. (R. 11, tr., at 37; *see, e.g., Norris v. Commissioner*, No. 11-5424, 2012 WL 372986, at *6 (6th Cir. Feb. 7, 2012) (ALJ explained rationale for granting weight, pointed to specific inconsistencies in opinion.)) In addition, it is not apparent from the decision that the ALJ considered any of the relevant factors in coming to that conclusion. *See, e.g., Wilson*, 378 F.3d at 546; *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316-317 (N.D. N.Y. 1998) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)) (failure to consider factors is grounds for reversal). A more thorough consideration of Dr. Morton's opinion is required on remand.

## B. Dr. Placeway

Hicks asserts that the ALJ did not consider, or even mention, the opinion of Dr. Placeway, an examining physician. (R. 16, PageID #: 2136; *see generally* R. 11, tr., at 1603-1608.) Regulations require an ALJ to evaluate every medical opinion received. *Smith*, 482 F.3d at 875 (ALJ must evaluate each medical opinion in the record); *Zimmerman v. Massanari*, 212 F. Supp. 2d 127, 134 (W.D. N.Y. 2002) (citing 20 C.F.R. §§ 404.1527(d) and 416.927(d)). Failure to do so is clear legal error justifying remand. *Zimmerman*, 212 F. Supp. 2d at 134.

The Commissioner responds that, although conceding the decision did not mention Dr. Placeway's October 2014 functional capacity assessment, "the ALJ repeatedly cited exhibit 14F, which contained Dr. Placeway's examination." (R. 17, PageID #: 2167.) The Commissioner also notes that the ALJ stated he reviewed and considered all the evidence in the record, and that the ALJ is not required to discuss all the evidence in the written decision. *Id.*, citing *Rudd v. Commissioner*, 531 Fed. Appx. 719, 730 (6th Cir. 2013).

There are two problems with the Commissioner's argument. First, even if the ALJ cited other pages of Exhibit 14F in the course of the decision, that exhibit (MetroHealth office treatment records) is 590 pages long. (R. 11, tr., at 1460-2049.) The court will not assume that that the ALJ properly evaluated an uncited medical opinion merely because the decision includes an occasional citation to several different pages of a 590-page exhibit that also includes that medical opinion.[5]

The *Rudd* case does not aid the Commissioner's argument either. In that case, the discussion did not concern an examining physician's functional capacity assessment, but rather evidence of a different, less critical nature, to wit:

> Rudd faults the ALJ for failing to address most of the vocational
> testimony in this case, including neuropsychological and brain injury
> evidence from the prior decision. But the ALJ was not required to

---

[5] The court notes that the ALJ's decision cites, for example, Exhibit 14F, p 145 when referencing claimant's dog walking activities. (Tr. 33, 36). Dr. Placeway's opinion starts at Exhibit 14F, p. 148 of 590 (Tr. 1607-08), which also has a different page numbering identifier at the bottom right labeled "Page 145." The ALJ's decision, however, is clear that the reference to "Exhibit 14F, p 145" is not referring to the page that includes the doctor's opinion.

discuss all the evidence, as long as her factual findings as a whole show that she implicitly considered the record as a whole.

*Rudd*, 531 Fed. Appx. at 730 (citing *Kornecky*).  In contrast, an ALJ is required to evaluate every medical opinion received.  *Smith*, 482 F.3d at 875

The failure to evaluate Dr. Placeway's medical opinion is clear legal error justifying remand.  *Zimmerman*, 212 F. Supp. 2d at 134.  An explicit consideration of Dr. Placeway's opinion is required on remand.

### C.  Dr. Wax

The ALJ addressed the opinion of Dr. Wax as follows:

> Less weight is given to the opinion of Dr. Wax who performed the consultative psychological examination on November 19, 2013.  He diagnosed the claimant with major depression with psychotic features due to her allegations of psychotic symptoms but this is not supported by her treatment records from Care Alliance, MetroHealth, and Murtis Taylor.  Moreover, Dr. Wax assigned the claimant a GAF of 41, which indicates serious symptoms and this is also not consistent with treatment records, which indicate intact thought contact, memory, judgment and insight (Exhibits 11F, p. 263; 12F, p. 23).

(R. 11, tr., at 37.)

The claimant argues that the ALJ's rationale is legally deficient.  (R. 16, PageID #: 2142.)  Hicks contends that the ALJ failed to give consideration to the Agency's "enhanced deference" to the opinions of examining sources.  *Id.*, citing 20 C.F.R. § 416.927(c)(1).

As stated above, an ALJ is required to evaluate all medical opinions, regardless of source, unless an opinion is a treating source's opinion entitled to controlling weight.  *Smith*, 482 F.3d at 875.  State agency psychological consultants are considered highly-qualified experts in disability evaluation, and the ALJ must

explain any rejection of the state-agency doctor's opinions. The ALJ is required to

consider the following factors in deciding the weight to give any medical opinion: the

length of the treatment relationship, the frequency of examination, the nature and

extent of the treatment relationship, the supportability of the opinion, the

consistency of the opinion with the record as a whole, and the specialization of the

source. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see generally Gayheart,* 710 F.3d at

376; *Cole,* 661 F.3d at 937. More weight is generally given to the opinion of an

examining source than to the opinion of a source who has not examined the

claimant. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1).

The ALJ implicitly recognized that the treatment relationship consisted of

the single consultative psychological evaluation with Dr. Wax on November 19,

2013. (R. 11, tr., at 37, 668-673.) The ALJ also mentioned the supportability of the

opinion, and the consistency of the opinion with the record as a whole. *Id.* at 37.

The decision's statement that Dr. Wax's diagnosis of Hicks with "major depression

with psychotic features" was based on claimant's allegations of psychotic symptoms

"but this is not supported by her treatment records from Care Alliance,

MetroHealth, and Murtis Taylor." *Id.*

The ALJ noted that "Dr. Wax assigned the claimant a GAF[6] of 41, which

indicates serious symptoms and this is also not consistent with treatment records,

---

[6] A GAF score is "a clinician's subjective rating of an individual's overall
psychological functioning," that is, a general assessment of an individual's mental
functioning. *Kennedy v. Astrue,* No. 06–6582, 2007 WL 2669153, at *5 (6th Cir.
Sept. 7, 2007). No particular amount of weight is required to be placed on a GAF
score. *Johnson v. Commissioner,* No. 12-2249, 2013 WL 5613535, at *10 (6th Cir.

which indicate intact thought contact, memory, judgment and insight (Exhibits 11F, p. 263; 12F, p. 23)." (R. 11, tr., at 37.) The decision cites to a December 10, 2013, mental health assessment by social worker Maria Mars, at MetroHealth. *See* R. 11, tr., at 1062 ("Exhibit 11F, p. 263"); *see generally id.* at 1058-1063. On that day, Mars had assessed Hicks as having "logical, organized" thought content, "with tight association," good recent memory and remote recall, fair judgment and insight, and no abnormal or psychotic thoughts. *Id.* at 1062. Mars did not assess or mention any indication of psychotic features.

The ALJ's other citation refers to a January 8, 2016, mental status exam by psychiatrist Amit Mohan, M.D., at Murtis Taylor Human Services. *See* R. 11, tr., at 1432 ("Exhibit 12F, p. 23"); *see generally id.* at 1430-1433. Hicks presented to Dr. Mohan for an initial evaluation for depression. *Id.* at 1430. Dr. Mohan assessed Hicks as depressed, with coherent thought processes and content, with no hallucinations or delusions, intact concentration, intact judgment and insight, and intact memory in all three spheres. *Id.* at 1432. Dr. Mohan diagnosed the claimant with "worsening depression and anxiety," and stated she "meets criteria for bipolar disorder." *Id.* Her anxiety symptoms are related to PTSD and generalized anxiety disorder. *Id.* The psychiatrist started prescriptions for Latuda and Neurontin,

---

Oct.15, 2013). The Sixth Circuit has pointed out that "the Commissioner 'has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy,* 2007 WL 2669153, at *5 (internal citations omitted).

noting that Hicks "has not been on medications for a couple of years and that seems to have her get worse." *Id.* Dr. Mohan did not assess or mention any indication of psychotic features.

The court may examine all the evidence in the record, regardless of whether such evidence was cited in the decision. *Walker,* 884 F.2d at 245; *Hubbard,* 2012 WL 883612, at *5 (quoting *Heston,* 245 F.3d at 535). The court notes that Dr. Wax's diagnosis of "major depression with psychotic features" also does not find support in the state agency psychological consultants' assessment of the claimant's psychological condition. *See generally* R. 11, tr., at 99, 102-103, 130, 133-134. Dr. Marlow and Dr. Rudy opined Hicks had an affective disorder that resulted in moderate or mild restriction of her activities of daily living, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 11, tr., at 99, 130.) Although both psychologists agreed that Hicks had depression, neither assessed or mentioned any indication of psychotic features.

The claimant points to evidence that would support a contrary conclusion to the ALJ's determination. (R. 16, PageID #: 2143-2146.) The relevant issue, however, is not whether there is evidence to support a ruling different than that reached by the ALJ. *Lebro ex rel. R.L. v. Commissioner,* No. 1:13CV1355, 2014 WL 3749221, at *11 (N.D. Ohio July 29, 2014). The Commissioner's determination must stand if supported by substantial evidence, regardless of whether some evidence might support another conclusion. *See Kidd v. Commissioner,* No. 99-6481, 2001 WL 345787, at *3 (6th Cir. Mar. 27, 2001); *Martin ex rel. Martin v. Chater,* 91 F.3d

144, 1996 WL 428403, at *4 (6th Cir. 1996) (TABLE, text in WESTLAW) (per

curiam); *Mullen,* 800 F.2d at 545*; Kinsella,* 708 F.2d at 1059.

The court finds that the ALJ's discussion of Dr. Wax's opinion is sufficient.

The decision evidences consideration of several of the relevant factors, and the ALJ

is not required to provide an "exhaustive factor-by-factor analysis" in the decision.

*Francis,* 2011 WL 915719, at *3.  The record evidence as discussed in the ALJ's

decision is such that "a reasonable mind might accept [it] as adequate" support for

the ALJ's decision concerning Dr. Wax.  *See Kirk,* 667 F.2d at 535 (quoting

*Richardson,* 402 U.S. at 401).


## VIII.  CONCLUSION

For the foregoing reasons, the court finds that the decision of the

Commissioner is not supported by substantial evidence.  The decision of the ALJ is

vacated and remanded for a more thorough consideration and explanation

analyzing the physicians' (Dr. Morton and Dr. Placeway) opinions as discussed

above.

IT IS SO ORDERED.


<u>s/ David A. Ruiz</u>
David A. Ruiz
United States Magistrate Judge


Date:  <u>September 27, 2018</u>